IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| ROLAND MAYCOLE, | : | CIVIL ACTION |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| PHILADELPHIA CORPORATION FOR | : | NO. 13-4047 |
| AGING, et al., | : | |
| Defendants. | : | |

## MEMORANDUM ORDER

AND NOW, this 31st day of March 2014, upon consideration of Defendants Philadelphia

Corporation for Aging and Deborah L. Elko's Motion for Summary Judgment (Doc. No. 15),

Plaintiff Roland Maycole's Memorandum of Law in Opposition thereto (Doc. No. 17),

Defendants' Memorandum of Law in Reply (Doc. No. 19), and Plaintiff's Sur-Reply (Doc. No.

24), it is hereby ORDERED that the Motion is GRANTED.

## I.   FACTUAL BACKGROUND

In 2003, Defendant Philadelphia Corporation for Aging ("PCA") hired Plaintiff, Roland

Maycole, as a Care Manager.  (Maycole Dep. 37:7–13, Doc. No. 17-3.)  PCA provides social

support and health services to senior citizens.  (PCA: History & Basic Facts 1, Doc. No. 15-5, at

27.)  Care Managers visit with senior citizens to assess their needs, design care plans to meet

those needs, and then stay in contact with the senior citizens to ensure that the care plans are

meeting their needs.  (Maycole Dep. 160:15–163:4.)  PCA assigned Maycole to a team of five or

six Care Managers supervised by Defendant Deborah Elko, one of PCA's Service Coordinator

Supervisors.  (Id. at 81:11–14; Elko Dep. 8:7–9:1, Doc. No. 17-5.)  Elko served as Maycole's

direct supervisor for the duration of Maycole's tenure with PCA.  (Maycole Dep. 81:15–17.)

Elko met with each Care Manager at least bi-weekly, and prepared their semi-annual and annual performance evaluations.  (Elko Dep. 13:3–12, 14:3–8.)

In December 2008, Elko provided Maycole with an annual evaluation indicating that his overall performance met only some of PCA's expectations for his position.  (2008 Annual Evaluation 4, Doc. No. 15-5, at 79.)  The evaluation includes the following warning: "If there is not significant improvement and demonstration of [Maycole's] ability to meet the requirements of the job, additional steps will need to be taken.  Because of the performance issues identified, this evaluation also serves as a written warning."  (Id. at 5.)  The evaluation indicates that one of Maycole's "performance goals" would be to demonstrate each month that "all home visits, reassessment visits, and phone contacts required for the month have been made."  (Id. at 4.)  The evaluation also indicates that Maycole was eligible for a four percent "merit increase" in pay. (Id. at 5.)

In June 2009, Elko rated Maycole's overall performance "Meets Some Expectations" in his semi-annual review.  (2009 Semi-Annual Review 1, Doc. No. 15-5, at 86.)  In the supervisor comments section, Elko expresses concern about Maycole's ability to "meet all of the standards and demands of the job related to both quality and quantity."  (Id.)  Elko also indicates that the semi-annual review would "serve[] as an extension of the written warning that was previously issued" because Maycole had failed to "meet the goal of compliance with contact requirements related to phone calls and follow up visits."  (Id.)  Elko concludes the evaluation as follows:

> Over the next six months [Maycole] will need to demonstrate his ability to meet all standards related to the Care Management position.  He needs to demonstrate ownership for his caseload and for completing all required tasks and follow up accurately, thoroughly, and in a timely manner.  If improvement is not noted and standards are not met in all performance domains on his annual evaluation, additional disciplinary steps may need to be taken.

(Id.)

2

Six months later, Elko provided Maycole with an annual evaluation recommending that PCA place Maycole on "probationary status" for two months.  (2009 Annual Evaluation 2, Doc. No. 15-5, at 88.)  In the evaluation, Elko rates Maycole's overall performance as "Meets Some Expectations."  (Id.)  Elko explains that Maycole had failed to meet the goals set in his June 2009 semi-annual review because he "continue[d] to struggle with meeting all contact requirements and in submitting work that requires minimal corrections."  (Id.)  Elko also warns Maycole that "termination [would] be recommended" if Maycole failed to meet the performance goals outlined in the annual evaluation.  (Id.)  Despite this warning, the evaluation indicates that Maycole was eligible for a two percent merit increase in pay.  (Id.)

Maycole and Elko met to discuss the 2009 annual evaluation on December 30, 2009.  (Id. at 3.)  According to Maycole, Elko wrote "a lot of things on the evaluation and [Elko] verbalized a lot, and [Elko] insisted that [Maycole] sign [the evaluation]."  (Maycole Dep. 128:2–4.) Maycole responded by asking Elko whether he could "take [the evaluation] home, read it[,] . . . digest it and bring a [Elko] a copy [the next day]."  (Id. at 128:5–8.)  Elko then "closed the door, . . . looked [Maycole] in [his] eyes with [a] very aggressive look," and asked him whether he "kn[e]w how to read."  (Id. at 128:8–13.)

On January 8, 2010, Maycole sent an email to PCA's human resources department expressing his desire to discuss "harassment charges, continuous attempts to intimidate and more."  (Email from Maycole to Moombi Pressley, Human Resources Generalist (Jan. 8, 2010), Doc. No. 15-6, at 73.)  Shortly thereafter, a PCA employee in the human resources department met with Maycole to discuss his allegations.  (Memorandum from Catherina K. Melissaratos, Human Resources Generalist, to Raymond Polak, Director of Human Resources, 1 (Jan. 12, 2010), Doc. No. 15-6, at 75.)  According to that employee's notes, Maycole explained that he

3

"felt like a target and that the 'rules' [did] not apply to him."  (Id.)  Maycole also indicated that

he felt like "Elko's behavior towards him [was] personal," which Maycole attributed to the fact

that he is "too passive at times."  (Id. at 2.)  After meeting with Maycole and Elko, PCA's human

resources department concluded that "Maycole's charges couldn't be substantiated."

(Memorandum by Heloise Lobo-Gallagher, Human Resources Generalist (Dec. 18, 2012)

(discussing the results of Maycole's January 2010 complaint), Doc. No. 15-6, at 82.)

       No semi-annual review or annual evaluation for 2010 is contained in the record.

However, the evidence indicates that in "late 2010" or "early 2011"—around the time Maycole

typically received his annual evaluation—Maycole and Elko met for a supervision meeting.

(Maycole Dep. 133:4–5, 134:3–14.)  According to Maycole, at some point during this meeting

Elko complimented him on his clothes and asked him whether his wife was "white" or "big."

(Id. at 132:17–19, 134:21–24; see also id. at 133:15, 245:4–7, 311:15–19.)  These comments

offended Maycole, who is African-American.  Maycole responded by asking Elko whether she

was "being biased because [Maycole is] black and . . . assum[ing] that [Maycole] should have a

huge wife."  (Id. at 133:18–21.)  Elko then said that she "would never do that."  (Id. at 138:11.)

Maycole was dissatisfied with Elko's response; he felt like she had taken his objection "as a

joke."  (Id. at 138:7–8.)

       In June 2011, Elko provided Maycole with a semi-annual review in which she rates his

overall performance "Meets Some Expectations."  (2011 Semi-Annual Review 1, Doc. No. 15-5,

at 91.)  Elko wrote in the review that Maycole "needs to demonstrate his ability to meet the

demands of the job including time frame requirements on an ongoing basis while consistently

meeting expectations in all areas of work performance."  (Id.)

Later that year, Elko gave Maycole his 2011 annual evaluation.  Elko notes in the evaluation that Maycole's "work ha[d] improved" in the preceding month.  (2011 Annual Evaluation 4, Doc. No. 15-5, at 93.)  Despite this improvement, Elko gives Maycole an overall rating of "Meets Some Expectations."  (Id. at 3.)  Elko also writes that "a verbal warning [would] be issued" because "concerns around timeliness, quality, and organization have been noted in previous evaluations and consistency in these areas has not been maintained throughout the past year."  (Id. at 4.)  The annual evaluation indicates that Maycole was eligible for a two percent merit increase in pay.  (Id. at 3.)

In June 2012, Elko rated Maycole's overall performance as "Meets All Expectations" in his semi-annual review.  (2012 Semi-Annual Review 1, Doc. No. 15-6, at 57.)  Elko also wrote that Maycole had been "largely successful" in meeting his performance goals due to his "hard and focused work" and her "continued close supervision."  (Id.)

On October 18, 2012, PCA placed Maycole on probationary status.  That day, PCA gave Maycole a document entitled "PCA Discipline Form" (PCA Discipline Form (capitalization omitted), Doc. No. 15-6, at 60), and a memorandum written by Elko that gives context for the discipline form (Memorandum from Elko to Maycole (Oct. 18, 2012), Doc. No. 17-8).  The memorandum includes a list of seventeen examples of ways in which Maycole had failed to meet PCA's performance standards after the June 2012 semi-annual review.  (Id. at 2–3.)  One example indicates that, in August 2012, Maycole failed to open "an email reporting the death of a consumer . . . and the case remained open to PCA for weeks after the consumer's death."  (Id. at 2.)  The memorandum concludes as follows: "As a result of the performance issues detailed above, [Maycole's] probationary status will be reinstated for a six month period.  Failure during

this period to meet all performance standards will lead to further disciplinary action up to and including termination of employment." (Id. at 3.)

PCA terminated Maycole's employment in February 2013—roughly four months into the six-month probationary period. Six notable events took place in these four months. We discuss each of these events in detail below. First, on October 24, 2012, Maycole emailed a complaint about Elko to Ann Danish, the Director of Care Management. (Email from Maycole to Danish (Oct. 24, 2012), Doc. No. 17-24.) Second, at some point in late 2012, Maycole requested medical leave from work to care for his ailing mother. (Maycole Dep. 150:22–151:5.) Third, in or around December 2012, Elko prepared a draft annual evaluation for Maycole that PCA never gave to him. (Elko Dep. 27:23–28:14.) Fourth, on December 24, 2012, Maycole met with Elko and Pearl Graub, the Assistant Director of Long Term Care Options and Elko's direct supervisor, to discuss errors in Maycole's billing—a meeting Defendants would later describe as "a trigger for [Maycole's] ultimate discharge." (Defs.' Reply Br. Supp. Summ. J. 6, Doc. No. 19.) Fifth, on February 7, 2013, PCA's third-party Family and Medical Leave Act ("FMLA") administrator retroactively approved Maycole's request for medical leave. (Letter from AmeriHealth Casualty to Maycole (Feb. 7, 2013), Doc. No. 17-17.) And sixth, on February 11, 2013, PCA informed Maycole that (1) it had been unable to substantiate Maycole's complaints about Elko (Memorandum from Lobo-Gallagher to Maycole (Feb. 11, 2013), Doc. No. 15-6, at 84); and (2) it had decided to terminate Maycole's employment as of February 22, 2013 (Memorandum from Elko to Maycole (Feb. 11, 2013), Doc. No. 15-6, at 71).

A. <u>Maycole's Complaint About Elko</u>

On October 23, 2012,[1] Maycole met with Danish to request that someone other than Elko supervise him.  (Email from Maycole to Danish (Oct. 24, 2012).)  Danish denied this request.

The next day, Maycole sent Danish an email explaining that he had requested a transfer so that he could work in a "fair, unbiased and productive working environment," and states that Danish's decision to deny that request had "given [him] no choice but to continue to work in [the] treacherous and hostile environment [that his] supervisor Deborah Elko ha[d] created for [him]."  (<u>Id.</u>)  Danish forwarded Maycole's email to Steve Touzell, the Director of Long Term Care.  (Email from Danish to Touzell (Oct. 24, 2012), Doc. No. 17-24.)  Touzell responded by telling Danish that she should forward Maycole's email to Ray Polak, the Director of Human Resources, because of Maycole's assertion of a "hostile work environment."  (Email from Touzell to Danish (Oct. 24, 2012), Doc. No. 17-24.)  It appears that Danish forwarded Maycole's email to Polak, because shortly thereafter Polak asked Heloise Lobo-Gallagher, a Human Resources Generalist, to investigate Maycole's complaints.  (Polak Dep. 10:8–10, Doc. No. 17-14; Lobo-Gallagher Dep. 7:1–16, 9:2–9, Doc. No. 17-11.)

Lobo-Gallagher and Maycole met on November 20, 2012.  (Memorandum by Lobo-Gallagher (Dec. 18, 2012), Doc. No. 15-6, at 82.)  According to the internal memorandum subsequently prepared by Lobo-Gallagher, Maycole said in the meeting that Elko was "treating him unfairly" and failing to "recogniz[e] his good work," and that Elko had asked him "if his wife is white" and whether he could read.  (<u>Id.</u>)  Lobo-Gallagher comes to the following

_____

[1] Maycole testified that this meeting took place in "November or December" 2012. (Maycole Dep. 234:16–19.)  However, Maycole's contemporaneous email indicates that this meeting took place on October 23, 2012.  (Email from Maycole to Danish (Oct. 24, 2012).)  The exact date of the meeting is immaterial to our analysis.

conclusion in the memorandum about Maycole's complaint: "[Human resources] is unable to substantiate the 11/20/2012 charges of harassment that [Maycole] is making against [Elko].  This appears to be a pattern by [Maycole] of making harassment charges against [Elko] when she confronts him with performance issues."  (Id.)  PCA informed Maycole of the results of its investigation on February 11, 2013, the day PCA also told Maycole that it would be terminating his employment.  (Memorandum from Lobo-Gallagher to Maycole (Feb. 11, 2013).)

### B. Maycole's Request for Medical Leave

In late 2012, Maycole asked for medical leave to care for his mother.  (Maycole Dep. 150:22–151:5.)  Maycole communicated this request to Elko, PCA's human resources department, and PCA's third-party FMLA administrator.  (Id. at 152:4–23.)  Maycole testified that Elko responded to his request by telling him that PCA was under a "heavy workload," and by "smirk[ing] with her glasses almost like [it was] not a good time."  (Id. at 153:2–4.)  Maycole felt like Elko's words and body language communicated disapproval of his request for leave.  (Id. at 153:10–21.)  Elko's disapproval did not dissuade Maycole; he took ten days off from work to care for his mother in January and February 2013.  See Part I.E, infra.

### C. Elko's Draft of Maycole's 2012 Annual Evaluation

In December 2012 or January 2013, Elko drafted Maycole's 2012 annual evaluation.  (Draft 2012 Annual Evaluation 3, Doc. No. 17-13.)  PCA never gave this draft evaluation to Maycole.  (Elko Dep. 28:14.)  Elko explained at her deposition that PCA withheld it because, "at this juncture, . . . a decision had been made to move towards termination."  (Id. at 28:16–18.)  It is not clear when the decision to withhold the evaluation was made.  Maycole has submitted a version of the evaluation that appears to have been last edited by Elko on January 2, 2013.  (Draft 2012 Annual Evaluation 3.)  It also appears that, on December 20, 2012, Graub sent a

version of the evaluation to Danish for her review.  (Email from Graub to Danish (Dec. 20, 2012), Doc. No. 17-28.)  That same day, Danish forwarded the evaluation to Touzell with the following message: "For your review – overall 2%.  ([Maycole] is now on probation.)  Because of his previous allegations about [Elko], do you think this should be reviewed by [human resources] as well?"  (Email from Danish to Touzell (Dec. 20, 2012), Doc. No. 17-28.)  The version of the evaluation submitted by Maycole reflects a recommended merit increase in salary of zero percent.  (Draft 2012 Annual Evaluation 3.)

    D.  <u>The December 24, 2012, Meeting Between Maycole, Elko, and Graub</u>

Elko and Graub met with Maycole on December 24, 2012, because "they were finding errors . . . in [his] billing."  (Maycole Dep. 215:8–10.)  These errors related to a new billing system that the Pennsylvania Department of Public Welfare instituted in the summer of 2012.  (Graub Dep. 41:16–24.)  PCA gave its employees extensive training on this new system and emphasized the importance of accurate billing.  (<u>Id.</u> at 42:15–43:1.)  As Graub put it in her deposition, "the summer of 2012 was a critical period" because "[t]he [long-term care options unit] program could not survive if there was deficient billing, fraudulent billing, [or other] issues with billing."  (<u>Id.</u> at 42:19–23.)  One area of training provided by PCA concerned how employees should record their time in the new system.  (<u>Id.</u> at 47:3–5.)  Rather than billing in minutes or hours, the new system required employees to calculate the number of "units" they had worked.  One unit is equivalent to fifteen minutes, with the unit rounded to the nearest whole number.  (Billable Minutes – Units, Doc. No. 15-5, at 49.)  Thus, less than 7.50 minutes of work is not billable, 7.50 to 22.49 minutes is equivalent to one unit, and so forth.  (<u>Id.</u>)  PCA provided its employees with a table of time-unit equivalencies for use in making these conversions.  (<u>Id.</u>; Graub Dep. 47:3–5.)

According to Elko's contemporaneous summary of the December 24, 2012, meeting, she and Graub asked for the meeting because Elko had discovered six examples of Maycole either under- or over-billing his time.  (Email from Elko to herself (Dec. 24, 2012), Doc. No. 15-5, at 53.)  In one case, Maycole billed one unit of time for six minutes of work.  Graub followed up on this mistake at the meeting by asking Maycole how many units he should bill for six minutes of work.  (Graub Dep. 46:14–15.)  According to Graub, Maycole responded incorrectly that one unit should be billed for six minutes.  (Id. at 46:15–16.)  Graub then asked Maycole to explain how he had arrived at that number.  (Id. at 46:19.)  Maycole responded by retrieving a "personally handwritten tool on a little scrap piece of paper whereby he calculated units."  (Id. at 46:22–24.)  Elko and Graub examined the piece of paper and found that Maycole's system was "way off."  (Id. at 47:1–2.)  Elko then provided Maycole with a copy of the official conversion sheet that PCA had distributed in training and Elko had given Maycole "multiple times."  (Id. at 47:2–5.)

After going over the conversion sheet with Maycole, Graub asked Maycole to convert some example times into units.  (Id. at 47:17–19.)  According to Graub, Maycole was unable to perform these conversions.  (Id. at 47:19–23.)  Maycole's inability to execute the conversions gave Graub the impression that PCA "had a significant problem" because "much of [Maycole's] billable units might be wrong."  (Id. at 48:1–3.)  After Maycole left the meeting, Graub instructed Elko to "do a systematic review of [Maycole's] caseload and documentation."  (Id. at 48:5–6.)  A week later, Elko, after reviewing one month of Maycole's billing, reported that she had found "74 or 84 units" (roughly 18.5 or 21 hours) "that were wrongly billed."  (Id. at 48:8–11.)  According to Graub, these errors were important: "if [they] came to the attention of the State," Graub testified, PCA "could be accused of Medicaid fraud."  (Id. at 48:11–13.)

When asked about this meeting at his deposition, Maycole admitted that there were errors in his billing, but explained that billing problems were widespread because PCA was "still figuring out the mathematical equation . . . for accumulating units." (Maycole Dep. 217:2–218:3.)

E.   Maycole's Request for Medical Leave Is Approved

On February 7, 2013, PCA's third-party FMLA administrator retroactively approved Maycole's request for intermittent leave between January 14 and April 14, 2013. (Letter from AmeriHealth Casualty to Maycole (Feb. 7, 2013).) PCA's records indicate that, between January 14 and February 22, 2013, Maycole took ten days off from work to care for a sick family member. (2013 Absence Summary, Doc. No. 15-5, at 62; accord Maycole Dep. 250:10–15.) There is no evidence that either Defendant prevented Maycole from taking leave while PCA employed him.

F.   PCA Informs Maycole that His Complaints About Elko Were Unfounded and that PCA Would Be Terminating His Employment

On February 11, 2013, Maycole received two memoranda: one from Lobo-Gallagher concerning the results of PCA's investigation into his November 2012 complaint about Elko; and one from Elko informing Maycole that PCA would be terminating his employment on February 22, 2013. Lobo-Gallagher's memorandum describes her investigation into Maycole's complaint and concludes as follows:

> I have reviewed the record and find that [Elko's] efforts to assist [Maycole] in meeting the performance requirements of [his] position, including the disciplinary action (reinstatement of probation) taken against [him] by PCA on the recommendation of [Elko] and her superiors, was supported by well-documented performance issues and does not constitute harassment.

> As a result of the above investigation, PCA is unable to substantiate [Maycole's] allegations and finds no violation by [Elko] of PCA policies or applicable law.

11

(Memorandum from Lobo-Gallagher to Maycole (Feb. 11, 2013).)  Elko's memorandum

explains that PCA had decided to terminate Maycole's employment because of his "failure to

demonstrate improvement in the following areas:"

1. Accuracy and thoroughness in [his] computer work as essential to prevent billing errors and to substantiate billing to the Department of Public Welfare Medical Assistance Program;
2. Accuracy and thoroughness in documenting clinical findings and tasks pertaining to participants in the Medical Assistance Program;
3. Timeliness of follow-up in a case in which a participant required durable medical equipment; and
4. Exercise of independent professional judgment essential to the handling of service coordination activities for Medical Assistance participants.

(Memorandum from Elko to Maycole (Feb. 11, 2013).)  Maycole's last day with PCA was

February 22, 2013.  (Maycole Dep. 252:14–17.)

On July 11, 2013, Maycole filed this lawsuit against PCA and Elko (collectively,

"Defendants").  (Compl. 1, Doc. No. 1.)  In his Complaint, Maycole alleges that Defendants

violated two statutes: he alleges in Count I that Defendants violated 42 U.S.C. § 1981 by

terminating his employment "because of his race and/or complaints of racial discrimination" (id.

¶ 35); and he alleges in Count II that "Defendants committed interference and retaliation

violations of the FMLA by terminating [Maycole] to prevent him from further exercising his

rights under the FMLA and because he exercised his rights during the last several months of his

employment with Defendants" (id. ¶ 43).

Presently before the Court is Defendants' Motion for Summary Judgment.  (Defs.' Mot.

Summ. J., Doc. No. 15.)  In his response to this Motion, Maycole indicates that "he is no longer

proceeding on [his § 1981 racial discrimination] claim."  (Pl.'s Br. Opp. Summ. J. 2 n.2, Doc.

No. 17.)  Having waived his § 1981 discrimination claim, Maycole now proceeds on three

claims: § 1981 retaliation, FMLA retaliation, and FMLA interference.  (Id. at 2.)

## II.   LEGAL STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A fact is material if it "'might affect the outcome of the suit under the governing law.'" Gonzalez v. Sec'y of Dep't of Homeland Sec., 678 F.3d 254, 261 (3d Cir. 2012) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)).  A dispute over a material fact is genuine "if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'"  Id. (quoting Anderson, 477 U.S. at 248).

When considering a motion for summary judgment, the Court must "view the facts in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor."  S.H. ex rel. Durrell v. Lower Merion Sch. Dist., 729 F.3d 248, 256 (3d Cir. 2013).

## III.   ANALYSIS

Maycole alleges that PCA terminated his employment for three improper purposes: (1) to retaliate against him for opposing racial discrimination; (2) to retaliate against him for requesting FMLA leave; and (3) to prevent him from taking future FMLA leave.  We consider each of these claims in turn.

### A.   Section 1981 Retaliation

Section 1981 is one of the nation's oldest civil rights laws.  It guarantees to "[a]ll persons" the same right to "make and enforce contracts . . . as is enjoyed by white citizens."  42 U.S.C. § 1981(a).  In its current form, "§ 1981's prohibition against racial discrimination in the making and enforcement of contracts applies to all phases and incidents of the contractual relationship, including discriminatory contract terminations."  Rivers v. Roadway Exp., Inc., 511

U.S. 298, 302 (1994).  The Supreme Court recently made clear that "§ 1981 encompasses claims of retaliation."  CBOCS W., Inc. v. Humphries, 553 U.S. 442, 457 (2008).

Maycole supports his § 1981 retaliation claim with circumstantial evidence. Accordingly, we analyze his claim under the McDonnell Douglas burden-shifting framework. See Estate of Oliva ex rel. McHugh v. New Jersey, 604 F.3d 788, 798 (3d Cir. 2010); see generally McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802–06 (1973).  This framework proceeds in three steps.  First, "the plaintiff bears the burden of making out a prima facie case." Burton v. Teleflex Inc., 707 F.3d 417, 426 (3d Cir. 2013).

Second, if the plaintiff carries his initial burden, the burden of production shifts to the employer to "'articulate some legitimate, nondiscriminatory reason' for its decision." Lichtenstein v. Univ. of Pittsburgh Med. Ctr., 691 F.3d 294, 302 (3d Cir. 2012) (quoting McDonnell Douglas, 411 U.S. at 802).  "At this stage, the defendant need not prove that the articulated reason actually motivated its conduct."  Burton, 707 F.3d at 426 (internal quotation marks omitted).

Third, if the employer carries its burden, the burden of production shifts back to the plaintiff to "provide evidence from which a factfinder could reasonably infer that the employer's proffered justification is merely a pretext for discrimination."  Id.  "To make a showing of pretext, 'the plaintiff must point to some evidence, direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action.'"  Id. at 427 (quoting Fuentes v. Perskie, 32 F.3d 759, 764 (3d Cir. 1994)).  Where the plaintiff's evidence relates to the "credibility of the employer's proffered justification," the plaintiff "'must demonstrate such weaknesses,

14

implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered

legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy

of credence.'" Id. (quoting Fuentes, 32 F.3d at 765).

      1.  Step One: Maycole's Prima Facie Case

To establish a prima facie case of § 1981 retaliation, the plaintiff must present evidence

that "(1) he engaged in protected activity, (2) his employer took an adverse employment action

against him, and (3) there was a causal connection between his participation in the protected

activity and the adverse employment action." Estate of Oliva, 604 F.3d at 798.

We will assume at this step that Maycole establishes a prima facie case. Accord

Atkinson v. LaFayette Coll., 460 F.3d 447, 454 (3d Cir. 2006) ("This Court will assume, without

deciding, that [the plaintiff] established a prima facie case of discrimination."); McGrath v.

Lumbermens Merch. Corp., 851 F. Supp. 2d 855, 860 (E.D. Pa. 2012) ("For our purposes here,

we will assume that [the plaintiff] has carried his step-one *prima facie* burden of production.").

In Part III.A.3, *infra*, we consider whether a reasonable jury could find any connection between

Maycole's complaints of racial discrimination and PCA's decision to terminate his employment.

      2.  Step Two: PCA's Legitimate Reason

Defendants argue that Maycole's "significant, well-documented billing errors" and long

history of performance issues provide a legitimate reason for PCA to terminate his employment.

(Defs.' Br. Supp. Summ. J. 7, Doc. No. 15-2.) We agree. In October 2012, PCA placed

Maycole on probationary status for six months and warned him that "[f]ailure during this period

to meet all performance standards [would] lead to further disciplinary action up to and including

termination of employment." (Memorandum from Elko to Maycole 3 (Oct. 18, 2012).) Two

months later, Elko and Graub discovered significant errors in the way Maycole recorded his

time.  At his deposition, Maycole admitted that he made errors in his billing.  (Maycole Dep. 217:22–218:3.)  These errors provide a non-discriminatory reason for PCA to terminate Maycole's employment.

      3.  <u>Step Three: Maycole's Evidence of Pretext</u>

      Maycole argues that a reasonable jury would have five reasons to disbelieve PCA's proffered reason for terminating his employment.  First, Maycole argues that PCA's decision to put him on six-month probationary status reveals that, in October 2012, PCA intended to employ Maycole for at least six more months.  (Pl.'s Br. Opp. Summ. J. 21.)  Maycole claims that PCA's decision to fire him after only four months reveals that PCA changed course because, among other reasons, Maycole "made a formal complaint of race discrimination on November 20, 2012."  (<u>Id.</u>)  This argument is unpersuasive because it ignores the fact that Maycole made numerous billing errors during the probationary period.  At step three, Maycole must point to evidence supporting the inference that PCA's proffered justification is pretextual.  Arguments suggesting an alternative, invidious reason for PCA's decision are insufficient without some evidence that the invidious reason motivated PCA's action.

      Second, Maycole argues that Defendants, Polak, and Graub gave inconsistent accounts of who made the decision to terminate Maycole's employment.  (<u>Id.</u> at 21–22.)  In response to Maycole's interrogatories, Defendants indicated that "Director of Human Resources[] Ray Polak, Director of Care Management Ann Danish, Assistant Director of Long Term Care Options Pearl Graub and Defendant Elko participated in the decision to terminate [Maycole's] employment." (Letter from Trisha M. Cruz, Counsel for Defendants, to Christine E. Burke, Counsel for Plaintiff, 1 (Dec. 9, 2013), Doc. No. 17-21.)  Maycole argues that the evidence is inconsistent regarding Polak's, Graub's, and Elko's role in the termination decision.  He claims that these

inconsistencies demonstrate that "[n]o one wants to admit who made the decision to terminate" and call into question the truthfulness of PCA's asserted reason for ending Maycole's employment.  (Pl.'s Br. Opp. Summ. J. 22.)

With regard to Polak, Maycole questions whether Polak actually participated in the termination decision.  At his deposition, Polak testified that his role in these decisions is to "ensure that procedures are followed and that the terminations are . . . legal."  (Polak Dep. 18:4–12.)  Maycole maintains that this oversight does not amount to participation in the "decision to terminate" Maycole's employment.  (Pl.'s Br. Opp. Summ. J. 22 (emphasis omitted).)  Whether Polak participated in the termination decision is a question of semantics.  And, even if PCA's description of Polak's role is slightly misleading, this fact does not support the inference that PCA's asserted reason for terminating Maycole's employment is pretextual.

As for Graub, Maycole argues that her participation in the termination decision is implausible because she never directly supervised Maycole and only began to oversee his performance indirectly in July 2012.  (Id.)  These facts provide no support for the inference that Graub would have played no part in the termination decision, particularly given Graub's role in the December 24, 2012, meeting.

With respect to Elko, Maycole argues that Elko and Polak gave inconsistent descriptions of Elko's participation.  (Id.)  When asked at her deposition whether she "ultimately ma[d]e the recommendation that Mr. Maycole should be separated from his employment," Elko responded that she did not.  (Elko Dep. 43:2–6.)  Maycole claims that this testimony conflicts with Polak's indication that "the first recommendation that there should be a discussion of termination" came from "Debbie Elko and Pearl Graub."  (Polak Dep. 9:16–23.)  As an initial matter, we note that these statements are not inconsistent: Elko testified that she did not recommend Maycole's

*termination*; Polak testified that Elko and Graub recommended that there be a *discussion of termination*.  But more importantly, this evidence does not support an inference of pretext. Minor inconsistencies regarding Elko's role in the termination decision do not cast doubt over whether Maycole made significant billing errors while on probationary status or suggest that an impermissible motivate was behind PCA's decision to terminate his employment.

Third, Maycole argues that "Graub and Elko gave two . . . completely different versions about when they decided to terminate Maycole's employment."  (Pl.'s Br. Opp. Summ. J. 23 (emphasis omitted).)  Elko testified that PCA withheld Maycole's draft 2012 annual evaluation because "a decision had been made to move towards termination."  (Elko Dep. 28:14–18.) Maycole argues that this timeline conflicts with Graub's testimony that the termination decision was "a process" that concluded "a few days before" February 11, 2013.  (Graub Dep. 48:14–49:1.)  These two bits of testimony are not in conflict.  Elko testified that PCA was moving toward termination in December 2012, and Graub testified that PCA made its final decision in early February 2013.  This explanation is consistent with PCA's proffered reason for terminating Maycole's employment.

Fourth, Maycole argues that a reasonable jury could question Defendants' "credibility and intent" because Defendants have submitted reasons for terminating Maycole's employment beyond the four given in the termination memorandum.  (Pl.'s Br. Opp. Summ. J. 23–24.)  We disagree.  Evidence that PCA had additional, non-discriminatory reasons for terminating Maycole's employment does not suggest that PCA terminated Maycole's employment for an illegitimate reason.  This evidence would be relevant if PCA "gave inconsistent reasons for terminating" Maycole's employment, but Maycole presents no evidence of such inconsistency. Farrell v. Planters Lifesavers Co., 206 F.3d 271, 281 (3d Cir. 2000).  Indeed, Defendants have

always maintained that PCA terminated Maycole's employment because of a variety of performance issues, including billing mistakes.  In February 2013, PCA told Maycole that it was terminating his employment because, among other reasons, he failed to demonstrate improvement in his ability "to prevent billing errors and to substantiate billing to the Department of Public Welfare Medical Assistance Program."  (Memorandum from Elko to Maycole (Feb. 11, 2013).)  And Defendants state in the present Motion that PCA terminated Maycole's employment because of "his numerous billing errors and poor work performance."  (Defs.' Br. Supp. Summ. J. 1.)

Fifth, Maycole argues that Elko's testimony that she could not recall Maycole making "[a]ny improvement" after PCA put him on probationary status in October 2012 (Elko Dep. 42:22–43:1) is belied by positive appraisals of Maycole's progress that she wrote at the time. (Pl.'s Br. Opp. Summ. J. 24.)  Maycole points to two examples of Elko acknowledging his improvement: (1) on December 6, 2012, Elko sent an email to herself indicating that Maycole "had called consumers he had not talked to" and that one of Maycole's notes "showed improvement" (Email from Elko to herself (Dec. 6, 2012), Doc. No. 17-23); and (2) in Maycole's draft 2012 annual evaluation, Elko writes that Maycole had made "some improvement . . . in some of the areas identified as problematic [in the October 2012 probation notice], particularly in the area of [Maycole's] responsiveness to emails and Auto Alerts and the provision of timely documentation" (Draft 2012 Annual Evaluation 2–3).  These documents suggest that Maycole made some improvement after October 2012, and that Elko's testimony does not reflect this improvement.  However, that Maycole made progress in some areas does not undermine Defendants' position that PCA had a different, legitimate reason for terminating Maycole's employment.  See Ezold v. Wolf, Block, Schorr & Solis-Cohen, 983 F.2d 509, 531

(3d Cir. 1992) ("A plaintiff does not establish pretext . . . by pointing to . . . commendation of the plaintiff . . . in categories the defendant says it did not rely upon in [deciding to take adverse employment action against the plaintiff].")  At most, Maycole presents evidence that Elko unfairly assessed his performance at her deposition.  But even if this is true, Elko's assessment does not support the inference that PCA terminated Maycole's employment for a discriminatory reason.  See Abramson v. William Paterson Coll. of N.J., 260 F.3d 265, 283 (3d Cir. 2001) (noting that "it is not enough for a plaintiff to show that the employer's decision was wrong or mistaken, because the issue is whether the employer acted with discriminatory animus"); cf. Allen v. PetSmart, Inc., 512 F. Supp. 2d 288, 296 (E.D. Pa. 2007) ("The Court does not sit as a super employment court to decide the merits of employment decisions.").

We will grant Defendants' Motion for Summary Judgment with respect to Maycole's § 1981 retaliation claim because the proffered evidence, considered as a whole, does not support the inference that PCA's stated reason for terminating Maycole's employment is pretextual.

B.  FMLA Retaliation

The FMLA entitles an eligible employee to "a total of 12 workweeks of leave during any 12-month period" to care for a "parent [who] has a serious health condition."  29 U.S.C. § 2612(a)(1).  Pursuant to the FMLA's anti-retaliation provision, "employers are barred from considering an employee's FMLA leave 'as a negative factor in employment actions.'" Lichtenstein v. Univ. of Pittsburgh Med. Ctr., 691 F.3d 294, 301 (3d Cir. 2012) (quoting 29 C.F.R. § 825.220(c)).

As with Maycole's § 1981 retaliation claim, Maycole's FMLA retaliation claim is analyzed under the McDonnell Douglas framework.  See Lichtenstein, 691 F.3d at 302.  To establish a prima facie case of retaliation under the FMLA, the plaintiff must present evidence

that "(1) she invoked her right to FMLA-qualifying leave, (2) she suffered an adverse employment decision, and (3) the adverse action was causally related to her invocation of rights."  Id.

Even if Maycole has established a prima facie case, he has not pointed to evidence from which a reasonable jury could infer that PCA's proffered justification for terminating his employment is merely a pretext for FMLA-prohibited retaliation.  With respect to the third McDonnell Douglas step, Maycole makes the same arguments in support of his FMLA retaliation claim that he makes in support of his § 1981 retaliation claim.  (See Pl.'s Br. Opp. Summ. J. 27 ("Mr. Maycole will not repeat the above-listed reasons why a fact finder could be inclined to disbelieve the asserted reasons, and why there are credibility issues that can only be determined by a fact-finder.").)  For the reasons discussed in Part III.A.3, *supra*, we conclude that Maycole fails to identify evidence supporting an inference of pretext.  Accordingly, we will grant Defendants' Motion for Summary Judgment with respect to Maycole's FMLA retaliation claim.

## C.  FMLA Interference

Maycole alleges in Count II of his Complaint that "Defendants committed interference and retaliation violations of the FMLA by terminating [him]."  (Compl. ¶ 43.)  While Maycole's claims of unlawful interference and retaliation overlap significantly, we analyze them separately because each is a distinct cause of action.  See Erdman v. Nationwide Ins. Co., 582 F.3d 500, 509 (3d Cir. 2009) ("hold[ing] that firing an employee for a valid request for FMLA leave may constitute interference with the employee's FMLA rights as well as retaliation against the employee").

21

To make out a prima facie case of FMLA interference, the plaintiff must show that (1) "he was entitled to benefits under the FMLA" and (2) "his employer illegitimately prevented him from obtaining those benefits." Sarnowski v. Air Brooke Limousine, Inc., 510 F.3d 398, 401 (3d Cir. 2007).  It is undisputed that Maycole was able to take all the FMLA leave that he requested; his claim of interference rests upon the allegation that PCA interfered with his right to take future leave by terminating his employment.  Accordingly, Defendants "can defeat [Maycole's] claim if [they] can demonstrate that [Maycole] was terminated for reasons 'unrelated to' [his] exercise of rights." Lichtenstein, 691 F.3d at 312 (quoting Sarnowski, 510 F.3d at 403).  For the reasons discussed in Part III.A, *supra*, we conclude that no reasonable jury could find that PCA illegitimately prevented Maycole from taking FMLA leave by terminating his employment.  We will therefore grant Defendants' Motion for Summary Judgment with respect to Maycole's FMLA interference claim.

## IV.   CONCLUSION

For the foregoing reasons, we grant Defendants' Motion for Summary Judgment.

BY THE COURT:

/s/ Legrome D. Davis

Legrome D. Davis, J.